Cite as 2025 Ark. App. 250

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-24-428

| | | |
|---|---|---|
| DEREK PAYNE | | Opinion Delivered April 23, 2025 |
| | APPELLANT | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT |
| V. | | [NO. 35CR-19-475] |
| STATE OF ARKANSAS | | HONORABLE JODI RAINES DENNIS, JUDGE |
| | APPELLEE | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Derek Payne was charged by felony criminal information in Jefferson County as a habitual offender with capital murder in the death of Christopher Jones, arson, and abuse of a corpse. Immediately before trial, the State moved to amend the information, nolle prossing the arson charge and reducing the capital-murder charge to murder in the first degree. The jury acquitted Payne of murder but convicted him of abuse of a corpse and sentenced him to thirty years' imprisonment. On appeal, Payne argues that the circuit court erred in denying his directed-verdict motion because the State failed to introduce substantial evidence that he knowingly mistreated or concealed a corpse in a manner offensive to a person of reasonable sensibilities. We affirm.

At trial, Captain Fred Tisdale, Jr., with the Pine Bluff Fire Department fire-marshal division, testified that on June 14, 2019, he responded to a fatal house fire; during his

investigation, he determined the fire originated in the back bedroom where Jones's body was located. Tisdale testified that the bedroom sustained "heavy damage" in the fire and that Jones's body was located to the left of the bedroom door. There were remnants of a mattress set in the middle of the back wall of the bedroom, and a generator was on the right side of the bed between the bed and the wall. Tisdale testified that the gas unit on top of the generator was missing its cap, and there were additional pieces of the generator housing— including a plastic shroud, a fuel cell, the coil system, and wiring—photographed with the gas unit. He was unable to determine the fire's ignition source due to the amount of damage; therefore, he ruled the cause of the fire undetermined. Tisdale also testified that a Rally's take-out bag was located on top of a three-drawer chest in the living room.

On cross-examination, Tisdale reiterated that he could not rule the fire accidental or intentional, so he had ruled it undetermined; and he agreed he could not say the fire was started by an individual, including Payne. He also testified that what looked to be an Ultra beer can and what appeared to be a hamburger, among other items and debris from the fire, were on the couch in the living room. Tisdale agreed that using generators inside is not a good idea because they produce carbon monoxide and are not safe to use indoors; he admitted that pieces of a generator were found close together, but not attached, in the bedroom where the fire originated. Tisdale could not determine whether the house was powered by the generator; a stolen commercial power meter was also on the house at the time of the fire. Tisdale explained that such a meter is not designed for basic house wiring because it allows excess power to come through the lines, which could cause the wiring to

melt down; he agreed that a commercial meter on a residential structure could be a possible fire hazard. Along with the generator, Tisdale found a microwave and what he believed were the remnants of a hotplate in the burned bedroom.

Nelson Kimble testified that Jones was a "very good friend" as well as his employee. He explained that after Jones's mother died, Jones encountered financial problems and could not keep his electricity turned on. Jones had asked Kimble if he could use Kimble's generator to run fans in the house; Kimble agreed to let Jones use it and explained the mixture of gasoline and two-cycle oil needed to operate it. Kimble said that the generator, which had a one- or two-gallon tank, was running properly when he loaned it to Jones—it did not leak, it started with two or three pulls, and he was not aware of any problems with the generator's functioning.

When Kimble learned there was a reward for information about the fire, he asked Payne what had happened; Payne told him that Jones had pulled the generator, and it had blown up in his face. Kimble asked Payne why he had not pulled Jones out of the fire, and Payne told him to "go ask Sarah." Kimble contacted the police after Payne placed himself inside the house at the time of the fire.

On cross-examination, Kimble said Jones had the generator for about two weeks; he had been with Jones on a couple of occasions when Jones had "cranked" the generator up; and Jones had never used the generator inside because Kimble had explained the danger of carbon-monoxide poisoning. However, Kimble admitted Jones did not have electricity and that he had never been inside Jones's house. He said that the day before Jones's death, he

had shown Jones how to mix the oil and gas for the generator and that Jones had been confused about how much "green oil" to mix with the gas.

Perry Burris testified that he, Jones, and Payne were drinking beer behind McDonald's and the gas station the day before the house fire. Burris left around dark; Jones, Payne, and Sarah Bray left at the same time, and they were headed toward Jones's house.

Lt. Steven Rucker of the Pine Bluff Police Department testified that during his investigation of the fire, he collected two knives and a pair of shoes as evidence. He said that he interviewed Payne on June 22 after Payne had been developed as a suspect, and Payne gave a statement. In that statement, Payne said that he and Jones were best friends, and he would never do anything to hurt him. He said that he and Jones had been drinking behind McDonald's, like they did almost every day, and they walked back to Jones's house. Payne said they had both been drinking, that Jones was complaining about the generator, and he asked Payne if he wanted to see the generator. Payne said that the next thing he knew, Jones had "fired that mother****er up" in the back bedroom, and before he knew it, there was a "boom," and fire was shooting out. Payne said that when the fire started, he was in the front room eating a Rally's hamburger; when he tried to pull Jones out, the flames hit him in the face. Payne said he did not know what to do, so he ran out the door; he said that Sarah was at Jones's house when the fire started, and she was the one who called for an ambulance from a neighbor's house. Payne said that he did not want to be at the house because he had an outstanding warrant, and he was trying not to get "locked up." Payne told Lieutenant Rucker that he tried to save Jones, but flames were shooting from the generator exhaust;

4

there was fire "everywhere"; and although he tried to save Jones, the fire was so hot that he could not. When Lieutenant Rucker told Payne that Jones had been stabbed in his chest and his throat had been cut and that Jones did not die from the fire but rather from the stab wounds, Payne told Lieutenant Rucker that he did not stab Jones. Payne asserted that he and Jones were "cool" and did not have any problems; Payne said that they could not charge him because he did not have anything to do with it. When told that Jones's throat had been cut before the fire, Payne continued to deny that he had anything to do with Jones's death. The officers told Pyane that he would be found guilty; Payne continued to deny involvement in Jones's death.

On cross-examination, Lieutenant Rucker said they went to Jones's house on two occasions to collect evidence; first in response to the initial call and again after speaking with the medical examiner on June 18. On the return visit, two kitchen knives were collected and submitted to the crime lab for analysis. Lieutenant Rucker said that he first learned that a generator might have been involved after speaking with one of the witnesses; however, he did not return to Jones's house to collect the generator, stating that he did not remember seeing it, and it would have been "so demolished" that he did not think about collecting it as evidence at that time. He said that he could tell that it was a generator, but it was "burnt up." Rucker agreed that Payne told him the generator had exploded, and he stuck to that story, even though Rucker did not agree with that version of events.

Chantelle Taylor, a former senior criminalist at the Arkansas State Crime Laboratory who examined the evidence in Payne's case, testified that she received some burned debris

5

to be examined for any ignitable liquids as well as kitchen knives to be examined for blood or DNA. Taylor found no blood on the knives. As for the burned debris, Taylor testified that she was looking for any components that could be used in an ignitable liquid and what the burning of the sample would produce. She was able to determine that gasoline was present in both samples.

On cross-examination, Taylor explained that she examined the wooden debris and found gasoline residues well above the threshold level, and it was easy to identify. She admitted that she could not say when a particular accelerant or liquid came to be on a surface or how it got there.

Dr. Adam Craig, a forensic pathologist and a medical examiner at the state crime lab, testified that he performed Jones's autopsy; much of Jones's skin had burned off, but on the front of Jones's neck, he noted what looked like hemorrhage or blood mixed in with the charred flesh. He opined that the bleeding indicated that an injury in that area had caused bleeding before the fire started. Because the fire had caused a lot of damage, he described the steps taken to further investigate Jones's neck structures, including his larynx and trachea. He said that a piece of thyroid cartilage still had some muscle tissue on it; he explained that the two ends of the cartilage should be together, but they were apart at the front. He pointed out the horizontal "sharp incised defect" on the trachea as well as the separation of the cartilage around the larynx region. Dr. Craig testified that he believed there was a hemorrhage, and not soot, in the larynx and trachea because of the dark red coloration in those areas.

Dr. Craig also noted several holes in Jones's rib cage; some of them were charred and burned, but one of the holes in the right upper part of his chest wall had a slit-shaped appearance with hemorrhage around the defect, and he concluded that it was a probable stab wound. He also noted a large defect in Jones's breastplate that appeared to have a dark red coloration, or hemorrhage. He explained that hemorrhage is evidence of an injury while a person is still alive; a wound would not bleed like that if a person was dead. Dr. Craig also testified that Jones's lungs were without significant thermal charring, meaning that they did not sustain much fire damage, and there was no apparent soot noted on the inner surfaces of Jones's airways, which meant Jones was not inhaling smoke or soot from the fire. Dr. Craig said that Jones's blood-alcohol level was 0.241 percent, and he had nicotine and an antidepressant medication in his system; he also had a carboxyhemoglobin level of 47 percent, which was an indication that carbon monoxide had been inhaled and was in his blood. Dr. Craig said the carboxyhemoglobin level led him to believe that even though he was injured, Jones was possibly still alive and inhaling carbon monoxide from the fire; however, he concluded that because of the defects in Jones's chest wall, smoke was allowed to enter the chest cavity, and it got close enough to the aorta or vessels near the heart that some of the carbon monoxide diffused into the blood he took as a sample, causing the carbon-monoxide level to be falsely elevated.

Dr. Craig testified that he was initially told that investigators believed the fire started in the bedroom with a mattress catching fire from a lit cigarette. He said that he had also been given Payne's version of events that the generator had blown up; if he was provided

7

with evidence of an explosion, that would change his opinion because if there was an explosion sufficient to cause shrapnel or debris to hit Jones in the front of his neck or chest, it was possible that the debris could have caused the injuries consistent with the ones seen during the autopsy. However, Dr. Craig opined that if there was no evidence of an explosion, the injuries he saw could not have been sustained accidentally, and he would say that the manner of death was homicide, which meant that Jones suffered the fatal wounds before the fire occurred.

On cross-examination, Dr. Craig said that while it was first reported to him that investigators believed the fire began because Jones was smoking a cigarette in bed, the evidence he found during the autopsy ran contrary to that scenario. With regard to the thyroid cartilage separation, Dr. Craig stated that the wound was vertical; he agreed that the wound could have been caused by shrapnel if there had been an explosion. As for the trachea defect, he said that it was a little over half an inch long, and he concluded that it was a sharp-force injury because it looked like an incised injury; it did not appear to be torn. However, when defense counsel pointed out that there was still a bit of bridging tissue connecting both pieces, Dr. Craig admitted that if it was a sharp-force injury and that the tissue should not still be connected. He also admitted that there can be bone fractures in fire deaths where the muscle breaks the bone because it is heated and is pulling the bones, which get brittle in a fire, and you would expect to see more charring if the bone had holes burned through it, as some of the rib injuries did. Dr. Craig admitted it was possible that the rib injuries could have been caused by shrapnel.

When asked whether it was difficult in this case to say with a high degree of medical certainty what caused Jones's injuries, Dr. Craig said that it would depend on the scenario; without an explosion, he was more confident that the injuries were inflicted by another person, but with an explosion, he was not so confident that the injuries were inflicted by another person. He did not know whether the explosion was confirmed by the fire department, but he had not been told about a generator in the bedroom with Jones until right before trial; he reiterated that if there was evidence of a possible explosion, that could change his opinion on what caused the injuries and the manner of death. He said that he did not do any further investigation to obtain any evidence to rule out an explosion, and he could not state with certainty that a generator did not explode and cause Jones's injuries.

On redirect, Dr. Craig stated that he was not sure that the bridging tissue in the picture was actually attached on both sides; he could not tell from looking at the photo. If he had seen anything that made him think it was not a laceration, he would have put it in his report.

The State rested after Dr. Craig's testimony, and Payne moved for a directed verdict. As to the abuse-of-a-corpse allegation, Payne argued:

> The State has failed to provide substantial evidence that the defendant knowingly mistreated or concealed a corpse in a manner offensive to a person of reasonable sensibilities. Specifically, Your Honor, I think what the medical examiner said was that he was unsure about the smoke inhalation. The fire—what the Court has heard is that this fire would be the abuse of the corpse, but the—Captain Tisdale can't tell you how the fire started—excuse me—he can't tell you that it was done purposely. It's undetermined. So the jury would be left to speculate on whether or not a person even started the fire. Captain Tisdale specifically said he could not say with certainty that a person started the fire. So with that, no proof of the fire being

9

at the hands of Mr. Payne, the State did—not met [sic] their burden or their—the threshold to survive a directed verdict as to abuse of a corpse, so we would ask for a directed verdict on Count Two as well.

In response, the State argued,

On the charge of murder in the first degree, Your Honor, we have heard testimony from Dr. Craig that it is his opinion that this is a homicide, that there is injury evidence that led him to believe that it was contradictory to an accident. It was contradictory to an accidental fire or house fire; that the injuries were sustained prior to his death, and that there is not evidence that he was breathing soot or smoke when the fire started. And that evidence is an indication that this was a homicide. There's also no evidence that anything exploded in that house. There is a picture of a very burned generator with a tank that the fire marshal testified did not explode. It is still intact. And I think that the evidence, while there is a factual question, there is circumstantial evidence sufficient that it should go before the jury. And I think additional evidence of the fact that the defendant lied to the police and the fact that the defendant fled the scene are also evidence of his consciousness of his guilt that the Court and the jury can consider. The State's theory is, Your Honor, that he stabbed the victim, and that, in an effort to cover that up, he poured gasoline around the room, which is why there was gasoline on the other side of the room, as per the crime lab report, and that—that he set the house on fire, and then he left; and he did that to cover up the evidence and that he did a pretty good job of covering up most of the evidence because the fire marshal ruled he couldn't determine the cause of the fire because there was too much damage. And the medical examiner testified he couldn't get more information about the injuries because of the damage of the fire. And, Your Honor, we believe that there is a factual question on the issue of first degree murder and abuse of a corpse sufficient to submit to the jury.

In denying Payne's motion for directed verdict, the circuit court found,

On the issue of the fact of how those injuries occurred; we have conflicting stories. We have our defendant's story, and then we have the doctor's medical examination of another possible reason for those injuries. That, in and of itself, is a fact issue for a jury to decide. I think it would be logical to follow, if the jury believes that it was from a stab wound, then the fire didn't accidentally happen and it would have been caused by a person or persons there. So that's a fact issue. So your motion for directed verdict is denied.

The defense rested without calling any witnesses and renewed its motion for directed verdict following the arguments made at the close of the State's case. The motion was again denied.

On appeal, Payne argues that the circuit court erred in denying his motion for directed verdict with respect to abuse of a corpse. A motion for directed verdict at a jury trial is considered a challenge to the sufficiency of the evidence. *Crider v. State*, 2024 Ark. App. 544, 700 S.W.3d 799. In reviewing a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. *Id.* We will affirm a conviction if there is substantial evidence, either direct or circumstantial, to support the verdict. *Id.* Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation and conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Collins v. State*, 2021 Ark. 35, 617 S.W.3d 701. Whether evidence excludes every other hypothesis is for the jury to decide. *Id.* Witness credibility is an issue for the finder of fact, which may believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Crider, supra.* A jury is entitled to draw upon common sense and experience in reaching its verdict. *Id.*

A person commits abuse of a corpse if, except as authorized by law, he or she knowingly physically mistreats or conceals a corpse in a manner that is offensive to a person

11

of reasonable sensibilities. Ark. Code Ann. § 5-60-101(a)(2)(A) (Repl. 2016). "In a manner offensive to a person of reasonable sensibilities" means "in a manner that is outside the normal practices of handling or disposing of a corpse" and includes the burning of a corpse. Ark. Code Ann. § 5-60-101(a)(2)(C). A person acts "knowingly" with respect to his or her conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist; or a result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result. Ark. Code Ann. § 5-2-202(2) (Repl. 2013).

Payne argues that the State's only evidence on the charge of abuse of a corpse is that he was present, with Sarah Bray, at Jones's house on the night of the fire; there was an accelerant on the debris in the bedroom where Jones died; and that he left the residence after the fire broke out. He contends that this evidence does not prove that he physically mistreated a corpse in a manner that is offensive to a person of reasonable sensibilities. We cannot agree.

There was conflicting evidence presented to the jury about the manner in which Jones died. The State asserted that Jones was stabbed to death, and the fire was started to cover up the murder; Payne claimed that the generator exploded, both killing Jones and starting the fire. The jury was entitled to determine the credibility of the witnesses before it, and it is the jury's responsibility to resolve any conflicts or inconsistencies in the evidence. Dr. Craig testified that it was his opinion that Jones died of stab wounds before the fire started because there was no soot in his lungs, indicating he was dead before the fire started. It is

12

reasonable for the jury to conclude that if Jones died before the fire started, Jones could not have started the fire by cranking an exploding generator. There was also no evidence that the generator exploded other than Payne's testimony. Furthermore, although Sarah Bray remained at the scene and called for help, Payne left the scene. Fleeing from the scene is evidence of consciousness of guilt and can corroborate evidence tending to establish guilt. *Lovelace v. State*, 2017 Ark. App. 146, 516 S.W.3d 300. We hold that there was substantial evidence to support Payne's conviction.

Affirmed.

HARRISON and TUCKER, JJ., agree.

*James Law Firm*, by: *William O. "Bill" James, Jr.*, and *Drew Curtis*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.